IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02452-NYW-SBP

E-GATE HOLDING AG, a Swiss
aktiengesellschaft,

        Plaintiff,

   v.

WALKER MANUFACTURING COMPANY,
a Colorado corporation; and FEDERICA
SPANO, an individual,

        Defendants.

---

## DEFENDANT FEDERICA SPANO'S ANSWER, AFFIRMATIVE DEFENSES, AND JURY DEMAND

---

Defendant Federica Spano, by and through her undersigned counsel, respectfully submits her Answer, Affirmative Defenses, and Counterclaims as follows.

## ANSWER

1. **In the late 1990s, Wolfgang Loerli (E-Gate's owner and CEO) purchased the exclusive rights to distribute Walker lawnmowers throughout Europe. He paid approximately $1 million for those exclusive distributorship rights.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

2. **Over the next 25 years, E-Gate invested an immense amount of time, money, and energy to growing the Walker brand in Europe. Through E-Gate's extensive European network of contacts, its ability to personally communicate with dealers throughout Europe (thanks to Mr. Loerli's fluency in several languages), and its unmatched expertise in the European lawnmower industry, E-Gate developed the best distributor network in Europe in the industry and cultivated excellent relations with customers. By 2011, E-Gate earned additional exclusive distributorship rights throughout the Middle East and Asia as well. As**

compensation, Walker agreed to pay E-Gate 10% of sales within its exclusive distributorship territory for so long as Walker sold mowers in the territory.

ANSWER: Ms. Spano lacks knowledge or information sufficient to form a belief as to the

truth of this allegation and on that basis denies it.

3.      In 2022, Walker devised a scheme under which it could obtain E-Gate's knowhow and trade secrets that would allow Walker to continue doing business in the Eastern Hemisphere without E-Gate's involvement-all in an effort to try to end the 10% commission payments to E-Gate. To accomplish this, Walker conspired with E-Gate employee and board member Federica Spano-Mr. Loerli's protege who was positioned to lead the next generation of E-Gate's distribution of Walker mowers abroad. At Walker's urging, Spano misappropriated and shared with Walker volumes of E-Gate's confidential and trade secret information regarding its distributor network in the Eastern Hemisphere, including valuable information regarding each customer that had been meticulously compiled over the years.

ANSWER: Ms. Spano lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding Walker's devising a scheme to obtain anything of value from E-

Gate. Ms. Spano denies any involvement in any such scheme, to the extent it exists. To the extent

any other allegations in this paragraph require a response, Ms. Spano denies them.

4.      Armed with E-Gate's trade secrets that were needed for continued operations in the Eastern Hemisphere, Walker then advised E-Gate that its exclusive distributorship rights were "terminated." However, those rights (which had been purchased from a third party and had always been recognized as E-Gate's personal and transferable property right) were owned outright by E-Gate and could not be "terminated" by Walker. Walker's unlawful attempt to claim the distributorship rights for itself and profit from E-Gate's network of contacts constitutes conversion and theft.

ANSWER: Ms. Spano is aware that Walker terminated its relationship with E-Gate. The

assertion that any purported rights were owned outright by E-Gate and could not be terminated, or

that such actions constitute conversion and theft, are legal assertions that do not require a response.

To the extent a response is required, Ms. Spano asserts that she lacks knowledge or information

sufficient to form a belief as to the truth of the allegations regarding Walker's conduct, and on that

basis denies them. Ms. Spano further denies that she was involved in any conduct constituting

conversion or theft. To the extent any other allegations in this paragraph require a response, Ms.

Spano denies them.

5.      **Walker then hired Spano as a "consultant," who brought with her even more of E-Gate's trade secrets that would allow Walker to continue selling mowers in the Eastern Hemisphere without having to compensate E-Gate for the fruits of its labor.**

**ANSWER:** Ms. Spano admits that Walker retained her as an independent contractor, and

further attests that Mr. Loerli advised her and encouraged her to seek opportunities with Walker.

All other allegations in this paragraph are denied.

6.      **In this action, E-Gate seeks damages from Walker and Spano for civil theft, misappropriation of business value, breach of contract, tortious interference with contract, unjust enrichment, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, misappropriation of trade secrets (under both the Colorado Uniform Trade Secrets Act and the federal Defend Trade Secrets Act), and civil conspiracy.**

**ANSWER**: Denied that E-Gate is entitled to any relief requested herein.

*Parties, Jurisdiction, and Venue*

7.      **Plaintiff E-Gate is an aktiengesellschaft (a Swiss corporation) organized under the laws of Switzerland and with a principal place of business located in Switzerland. Wolfgang Loerli, E-Gate's owner and CEO, is a citizen and resident of Switzerland.**

**ANSWER**: Admitted.

8.      **Defendant Walker is a Colorado corporation with a principal place of business located at 5925 East Harmony Road, Fort Collins, Colorado 80528.**

**ANSWER**: Admitted.

9.      **Defendant Spano is an individual over the age of eighteen who resides in Switzerland and is a citizen of Italy.**

**ANSWER:** Admitted.

10.     **This Court has personal jurisdiction over Defendants because Walker is a Colorado corporation that is based in Colorado and transacts business in Colorado, and**

Spano's relevant actions and omissions set forth herein were taken for the benefit of Walker and in furtherance of Walker's business operations in Colorado.

**ANSWER**: Ms. Spano does not contest that the Court has personal jurisdiction over her.

**11.**     **This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff on the one hand and Defendants on the other, and the amount in controversy exceeds $75,000. This court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based on E-Gate's claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.**

**ANSWER**: Admitted.

**12.**     **Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).**

**ANSWER**: Ms. Spano does not contest venue in this Court.

*General Allegations*
*The history of Walker's European distribution*

**13.**     **Walker was founded by Max Walker in 1975 in Fort Collins, Colorado for purposes of manufacturing and distributing American-made lawn mowers and related products.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

**14.**     **Walker gained popularity throughout the United States in the 1970s and early 1980s. In 1984, Walker delivered its first mower to Europe.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

**15.**     **On or about the time the first Walker mower arrived in Europe, Walker was introduced to Sven Gillfors, a long-time manufacturer's representative from Malmo, Sweden.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

**16.**     **Around that time, Mr. Gillfors acquired from Walker the exclusive rights to distribute Walker mowers throughout Europe.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

17.     **By 1999, through the efforts of Mr. Gillfors, approximately 11 % of all Walker mowers produced were sold throughout Europe.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

*Walker's relationship and expansion through E-Gate*

18.     **Beginning in or around 1995, Mr. Gillfors began to plan for his retirement and the succession of his work for Walker.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

19.     **By this time, Max Walker's son, Bob Walker, had taken over as President of Walker.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

20.     **On July 26, 1995, with the knowledge and consent of Bob Walker, Mr. Gillfors executed a "Takeover Agreement" with Wolfgang Loerli for Mr. Loerli's company, E-Gate, to acquire the exclusive rights to distribute Walker products throughout the European market.**

**ANSWER**: Ms. Spano is aware of the existence of a document matching the general description in this paragraph, though she does not have it or a copy of it in her possession and cannot attest to its authenticity. To the extent this paragraph simply describes the contents of this document, Ms. Spano states that the document speaks for itself and denies all allegations inconsistent therewith. To the extent this paragraph makes legal assertions based on this document, Ms. Spano asserts that no response is required, and that to the extent a response is required, she

lacks knowledge or information sufficient to form a belief as to the truth of those assertions. To the extent any other allegation in this paragraph requires a response, Ms. Spano denies it.

**21.     Pursuant to the Takeover Agreement, E-Gate would take over distribution in certain European countries immediately, then upon the payment of additional sums and after three years, would also succeed to the exclusive distribution rights in Sweden, Denmark, Norway, Iceland, Finland, Estonia, Latvia and Lithuania.**

**ANSWER**: To the extent this paragraph simply describes the contents of the document, Ms. Spano states that the document speaks for itself and denies all allegations inconsistent therewith. To the extent this paragraph makes legal assertions based on this document, Ms. Spano asserts that no response is required, and that to the extent a response is required, she lacks knowledge or information sufficient to form a belief as to the truth of those assertions. To the extent any other allegation in this paragraph requires a response, Ms. Spano denies it.

**22.     The total consideration paid by E-Gate to Mr. Gillfors for the takeover of its exclusive rights to distribute Walker products was approximately $1,000,000.00 USD in the late 1990's.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

**23.     Upon the completion of E-Gate's takeover, in or about 1999, Mr. Bob Walker issued one of Walker's regular publications called Walker Talk wherein he credited Mr. Gillfors for his successes in expanding Walker throughout Europe and announced that E-Gate had succeeded Mr. Gillfors as the exclusive distributor of Walker mowers in Europe.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

**24.     E-Gate continued to carry on the great work of Mr. Gillfors in expanding Walker throughout Europe and internationally and acted as its liaison to countries with whom Walker would otherwise have no relationship and no foundation for communication. Wolfgang Loerli (E-Gate's principal) was able to communicate with European importers and distributors in a way that Walker could not-not only because he fluently speaks several languages, but also because he is uniquely well versed in the European way of doing business**

which differs dramatically from the American way of doing business, especially with distributorships. Moreover, Mr. Loerli is an expert in the lawnmower industry in Europe. He learned the industry at a young age by working with his father, who was the largest independent distributor of gardening equipment in Switzerland. Through his father, Mr. Loerli met and developed personal relationships with nearly all the European distributors in the industry, and those personal relationships were critical to Walker's success in Europe.

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

25.   **Mr. Bob Walker recognized E-Gate's instrumental role in Walker's growth and success. In a letter dated April 1, 2011, Mr. Bob Walker acknowledged the expansion of E-Gate's territory to cover the entire eastern half of the world extending from meridian 20W eastward to meridian 180. This expanded territory included all of Europe, Asia, Africa, and the Middle East, except for Australia, New Zealand, New Caledonia, Israel, South Africa, and Guam.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

26.   **In 2016, Mr. Walker wrote to E-Gate again, this time per E-Gate's request for written confirmation of its ownership of exclusive distribution rights in the territory to which those rights applied, and for clarification that the rights were transferrable by E-Gate in contemplation of its formation of a new entity: [image omitted]**

**ANSWER**: To the extent this allegation simply describes the contents of a written document, the documents speaks for itself. Ms. Spano denies any allegations to the extent they inaccurately describe the contents of the document. Ms. Spano is aware of the existence of this letter, though she does not have it or a copy of it in her possession. To the extent any other allegations require a response, Ms. Spano denies them.

27.   **Importantly, this confirmation letter acknowledged that E-Gate was the "owner" of the exclusive rights to distribute Walker products in the Eastern Hemisphere, and that E-Gate was entitled to transfer those rights. Consistent with the fact that E-Gate purchased these exclusive distribution rights from a third party for approximately $1 million, this letter confirmed that the exclusive distributorship rights were a property right owned by E-Gate that could not be canceled, terminated, or retracted by Walker.**

**ANSWER**: To the extent this allegation simply describes the contents of a written document, the documents speaks for itself. Ms. Spano denies any allegations to the extent they inaccurately describe the contents of the document. Ms. Spano is aware of the existence of this letter, though she does not have it or a copy of it in her possession and cannot attest to its authenticity. Ms. Spano further states that the assertion that E-Gate owned exclusive distributorship rights, or that these purported rights could not be canceled, terminated, or retracted by Walker, are legal assertions that do not require response. To the extent a response is required to these allegations or any other allegations in this paragraph requiring a response, Ms. Spano denies them.

28.     **In reliance on Walker's confirmation letters, E-Gate continued to expand Walker's international distribution within its territory and to work tirelessly as Walker's largest international manufacturer's representative for the next eight years.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of the allegation that E-Gate acted in reliance on Walker's confirmation letters. Ms. Spano admits that E-Gate worked to expand Walker's presence during the time she was involved with the company. To the extent any other allegations require a response, Ms. Spano denies them.

29.     **Indeed, Mr. Loerli, who at all times has been the owner and CEO of E-Gate, has travelled around the world at Walker's behest, regularly leaving behind his five children and at the expense of two different marriages. Mr. Loerli flew approximately 150,000 miles per year, including 4-6 trips to Walker's headquarters each year to gain first-hand information from the factory for customers abroad, an annual trip to the most important U.S. trade show in Louisville, trips to attend all major European trade shows (including those in the UK, Netherlands, Germany, Italy, France, and Switzerland), trips to personally visit dealers and distributors (to nurture and build relationships, to expand sales, and to find solutions for dissatisfied customers), and trips to personally visit prospective new customers and importers (including preparation visits, sales pitch meetings, and visits to provide comprehensive training on Walker products for new customers). Mr. Loerli spent 50-75 nights in hotels each year, and over the past 25 years, accumulated over 4 million air miles traveling for E-Gate and developing business for Walker.**

**ANSWER**: Ms. Spano is aware that Mr. Loerli, the owner and CEO of E-Gate, often travelled for work-related reasons during the time she was involved with the company. However, she lacks knowledge or information sufficient to form a belief as to the truth of the specific details alleged in this paragraph, particularly to the extent they describe Mr. Loerli's activities before she became involved with the company. To the extent any other allegations require a response, Ms. Spano denies them.

30. **By 2022, E-Gate had grown Walker's distribution to 23 importers/distributors in the following countries: Norway, Sweden, Finland, Denmark, Germany, Holland, Belgium, France, Switzerland, Spain, Italy, Austria, Iceland, UK, Ireland, Latvia (Baltics), Poland, Hungary, the Czech Republic, Russia, Japan, Vietnam, and South Korea. E-Gate had also developed relationships for Walker with the FIFA World Cup in Quatar in 2022 and in the United Arab Emirates.**

**ANSWER**: Admitted that by 2022 Walker's distribution network had grown to include distributors in the listed countries. Denied that this growth is attributable to E-Gate, as in many if not most instances, the contacts were referred to E-Gate by Walker. To the extent any remaining allegations require a response, Ms. Spano denies them.

31. **As part of the services it provided for years for Walker, E-Gate not only selected each international distributor/importer with whom it thought Walker could develop a long and prosperous relationship, it also trained its distributors in the use and demonstration of Walker products for re-sale to end customers, and acted as their point of communication with Walker.**

**ANSWER:** Denied that E-Gate selected each international distributor/importer with whom it thought Walker could develop a long and prosperous relationship; in reality, Walker referred most if not all these contacts to E-Gate. Denied that E-Gate's "services" included any meaningful training to distributors. To the extent any remaining allegations require a response, Ms. Spano denies them.

32.     Because of its integral role for Walker, E-Gate over the years operated under certain business names associated with Walker and using the Walker logo with the knowledge and consent of Mr. Bob Walker. For example, in or around 2000, E-Gate formed Walker International EMEAA (standing for Europe, Middle East, Asian and African countries) and held itself out as a Senior Strategy Consultant for Walker with respect to Walker's international growth strategy. In 2018, E-Gate formed Walker Mowers Switzerland AG to handle Walker's distribution needs in Switzerland. In 2021, E-Gate formed Walker Mowers EMEAA, LLC, a Delaware limited liability company, to liaise with Walker in the United States and to accept payment of E-Gate's commissions from Walker.

ANSWER: Ms. Spano admits that E-Gate formed Walker Mowers Switzerland AG in 2018, and formed Walker Mowers EMEAA, LLC in 2021. Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and on that basis denies them.

33.     As compensation for E-Gate's efforts for Walker dating back to 1995, Walker has paid E-Gate a monthly commission of 10% of Walker's revenue received on goods it sold and delivered within E-Gate's exclusive territory, with the understanding that this 10% commission would be paid so long as Walker sold mowers in E-Gate's territory.

ANSWER: Ms. Spano admits that Walker paid E-Gate a commission of 10% of Walker's revenue received on goods sold and delivered within E-Gate's territory. Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and on that basis denies them.

34.     From 1995 continuing through the end of 2022, E-Gate's 10% commission structure had never been altered, renegotiated, or questioned by either side.

ANSWER: Denied.

*E-Gate develops Spano to lead E-Gate for the next generation*

35.     In 2015, E-Gate hired Federica Spano to assist with the ever-increasing volume of work involved with distributing Walker products overseas.

ANSWER: Admitted that E-Gate hired Ms. Spano in 2015 as a Management Assistant.

36.     Spano's employment contract prohibited her from engaging in secondary employment while employed by E-Gate, and Article 6 of Spano's employment contract contains the following confidentiality provision:

> The employee is obligated, both during and after the termination of the employment relationship, to keep confidential all business matters such as operational, technical, financial, and organizational conditions, security measures, and all types of operational processes, specifically manufacturing and trade secrets, as well as customer bases. The employee must not exploit this knowledge for personal gain or disclose it to third parties.

**ANSWER:** The document speaks for itself. Ms. Spano denies any allegations that are inconsistent with the written instrument.

37.     In addition to being a trusted employee, Spano also sat on E-Gate's board of directors. Spano thus owed fiduciary duties to E-Gate not only as an employee, but also as a director.

**ANSWER**: Ms. Spano admits that she was designated as a director of E-Gate, though this was largely a pro forma designation that involved few if any additional work obligations (other than being able to co-sign certain documents on behalf of the company) and did not include any additional compensation. The remaining allegations of this paragraph are legal assertions that do not require a response.

38.     Mr. Loerli trained Spano in all aspects of E-Gate's business. He taught her E-Gate's unique strategies and methodologies specific to each country within E-Gate's distribution network, each of which was different based on industry nuances, competition, and market conditions within each specific country. He introduced her to E-Gate's customers and contacts, and eventually Ms. Spano came to know all of E-Gate's international distributors for Walker.

**ANSWER**: Ms. Spano denies that she was trained or involved in "all" aspects of E-Gate's business, though she was familiar with much of it. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

39.     Spano was the only other person (other than Mr. Loerli) who had full access to E-Gate's Customer Relationship Management ("CRM") online platform, Basecamp.

**Basecamp contained an extensive list of each of E-Gate's contacts and customers. In Basecamp, E-Gate maintained detailed reports of its physical and Zoom meetings-which included insights on distributors, markets, and local competition-with each of E-Gate's contacts and customers. This included not only E-Gate's existing network but also all correspondence and work with potential new distributors and customers. E-Gate maintained confidential and proprietary notes regarding its judgments and strategies in Basecamp. E-Gate also used Basecamp as an internal project management tool. For example, E-Gate gathered essential information over the years regarding the electrification of the industry and monitored competitors and industry trends.**

ANSWER: Denied that Ms. Spano and Mr. Loerli were the only individuals with access to Basecamp, which is a web-based project management platform used by E-Gate and which had certain information relevant to E-Gate's operations. To the contrary, Mr. Loerli provided several Walker employees with complete access to Basecamp throughout the time of Ms. Spano's employment. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

**40.    In essence, the information in Basecamp consisted of the "secret sauce" that allowed E-Gate to maintain and develop its distributorship network in the Eastern Hemisphere. The information in Basecamp had incredible value and was only fully accessible to Spano and Mr. Loerli.**

ANSWER: Denied.

**41.    Through her experience as an E-Gate employee and board member, Mr. Loerli came to view Spano as a trusted protege who would carry on the E-Gate business after he retired. In fact, in or around early 2022, E-Gate informed Walker that Spano was being groomed on a five-year track to take over E-Gate's business.**

ANSWER: Ms. Spano lacks knowledge or information sufficient to form a belief as to Mr. Loerli's views, or what E-Gate or Mr. Loerli told others about her outside of her presence. Ms. Spano is aware of some plans Mr. Loerli drafted that included discussions of an ongoing role for Ms. Spano with E-Gate, and she discussed those plans with Mr. Loerli on a limited basis, though she never agreed to any such plan (even in principle) and expressed only limited interest in the

prospect. As such, these discussions never went beyond the preliminary level. To the extent any remaining allegations require response, they are denied.

*Walker's circumvention and betrayal of E-Gate*

42.    As a family run business, beginning about ten years ago, Bob Walker began to transition some responsibilities to his nephew, Ryan Walker.

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

43.    Ryan had a different management style than his uncle and frequently delegated duties to others, whereas Bob Walker had been extremely hands-on.

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

44.    In or around 2020, Ryan Walker hired a sales manager named Bob Clancy who was purportedly in charge of certain regions of Walker's sales, including E-Gate's "EMEAA" (Europe, Middle East, Asia, and Africa) territory.

**ANSWER**: Admitted that Ryan Walker hired Bob Clancy as a sales manager, and that Mr. Clancy oversaw Walker's sales in some or all of the above-listed territories. To the extent any remaining allegations require response, Ms. Spano denies them.

45.    Tensions developed between E-Gate and Mr. Clancy as a result of Mr. Clancy not understanding E-Gate's historical role with Walker.

**ANSWER**: Ms. Spano is generally aware of friction between Mr. Clancy and Mr. Loerli, though she lacks knowledge or information sufficient to form a belief as to the truth of the allegation that tensions developed specifically because of Mr. Clancy's purported lack of understanding of E-Gate's historical role with Walker. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

46.    For example, in 2022, Walker provided E-Gate with an organizational chart for Walker that identified Mr. Loerli as a Walker employee who reported to Mr. Clancy.

**ANSWER**: Ms. Spano is aware of the existence of the organizational chart referenced in this paragraph, but lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding its contents and on that basis denies them.

47.     In response, Mr. Loerli clarified that neither he nor E-Gate has ever been employed by Walker, nor does Walker direct the terms of E-Gate's work. Indeed, for the past twenty or so years, Mr. Bob Walker had been grateful for E-Gate's autonomy in performing its services and trusted E-Gate's judgment as Walker's cultural expert in the EMEAA.

**ANSWER**: Ms. Spano is aware of communications by Mr. Loerli to Walker generally consistent with the description in this paragraph. Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and on that basis denies them.

48.     Ryan Walker, however, did not have the same appreciation for E-Gate as his uncle. Under Ryan Walker's new leadership, Walker saw an opportunity to circumvent E-Gate's rights and eliminate the 10% commission to E-Gate while continuing to reap all of the benefits that E-Gate had sown for Walker.

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

49.     By the middle of 2022, Walker had begun secretly negotiating with Spano to exploit her knowledge of E-Gate's business and relationships and join Walker to the exclusion of E-Gate.

**ANSWER**: Denied.

50.     While Spano remained a key employee and Board member of E-Gate, she also took steps at the behest and encouragement of Walker to circumvent E-Gate for the benefit of herself and her future relationship with Walker.

**ANSWER**: Denied.

51.     Walker knew that it did not have the relationships or cultural experience to succeed in the EMEAA without an international liaison, and as such, its recruitment of Spano and her agreement to the same were fundamental to Walker's plan.

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to what Walker knew or understood. Denied that Ms. Spano was recruited or agreed to this recruitment. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

52.     **Assured of her future with Walker, Spano attempted to copy E-Gate's records and systems (including the valuable CRM information in Basecamp), took steps to usurp E-Gate's distribution relationships, and disguised her allegiance with Walker from E-Gate for months.**

**ANSWER**: Denied.

53.     **Bringing its plan to fruition, on September 30, 2022, Walker, acting through Ryan Walker and Mr. Clancy, handed E-Gate a letter that purported to be a "termination" of E-Gate's "contractual relationship with Walker Manufacturing Company and/or any subsidiary company owned, controlled or otherwise associated with Walker Manufacturing Company" effective December 31, 2022.**

**ANSWER**: Ms. Spano is aware that on or around September 30, 2022, Walker gave a letter to E-Gate to terminate its relationship with E-Gate effective December 31, 2022. To the extent this allegation simply describes the contents of a written document, Ms. Spano states that the document speaks for itself and denies any allegations to the extent they inaccurately describe the contents of the document. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

54.     **The curt divestiture of E-Gate's entire business and decades of service for Walker went on to state: [image omitted]**

**ANSWER**: To the extent this allegation simply describes the contents of a written document, Ms. Spano states that the document speaks for itself and denies any allegations to the extent they inaccurately describe the contents of the document. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

55.     Spano did not reveal that by this time she had already started collaborating with Walker. In October 2022 (shortly after Walker delivered the termination letter), Spano proposed formally terminating her employment with E-Gate on December 31, 2022. E-Gate agreed, and Ms. Spano remained an employee of E-Gate through December 31, 2022.

**ANSWER:** Denied that by this time Ms. Spano had already started collaborating with Walker. Denied that Ms. Spano concealed any involvement with Walker from E-Gate or Mr. Loerli. To the contrary, Ms. Spano was open with Mr. Loerli about her attempts to pursue work with Walker after Walker terminated E-Gate; in fact, he actively encouraged Ms. Spano to do so. Admitted that Ms. Spano and E-Gate mutually agreed that she would end her employment with E-Gate following December 31, 2022. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

56.     Even though she disguised herself as an ongoing loyal employee of E-Gate, Spano continued to deceptively siphon information from E-Gate to Walker. For example, on December 12, 2022, Mr. Loerli informed Spano that he would be shutting down E-Gate's Basecamp platform and deleting the content for which she had administrator's rights. Spano asked Mr. Loerli not to delete the content but rather just archive it, asserting that perhaps one of the distributors might want access one day. Mr. Loerli obliged and only archived the content. This allowed Spano to continue to access E-Gate's valuable trade secret information stored on Basecamp and feed it to Walker.

**ANSWER**: Admitted that Ms. Spano asked Mr. Loerli not to delete the content, and to inform the distributors about his decision to delete this information so they could have time to download their own data. Ms. Spano understands that Mr. Loerli complied with this suggestion, at least for a time. All other allegations in this paragraph are denied.

57.     When Spano left E-Gate at the end of December 2022, Mr. Loerli asked her to delete all E-Gate data and to remove her access to Basecamp and other electronically-stored company data. However, Mr. Loerli later found out on February 22, 2023 that Spano had retained access to Basecamp, which required E-Gate to formally block her access at that time. This period of extended access would have allowed Spano to continue to share E-Gate's valuable trade secret information with Walker.

**ANSWER**: Denied that Mr. Loerli asked Ms. Spano to delete E-Gate data or remove access to Basecamp and other electronically stored company data. Admitted that Ms. Spano technically still had access to Basecamp as of February 2023, though she was unaware that she still had access. Denied that Ms. Spano attempted to access Basecamp after her termination. All other allegations in this paragraph are denied.

58.     **Further, Spano did not resign from her seat on E-Gate's board of directors until April 11, 2023. During this period she was disloyal to E-Gate and worked for Walker to the express detriment of E-Gate.**

**ANSWER**: Admitted that the action to formally remove Ms. Spano from E-Gate's board of directors was not taken until April 11, 2023. All other allegations in this paragraph are denied.

59.     **In approximately June of 2023, Walker formally hired Spano as a consultant. This role made it even easier for Spano to continue to share E-Gate's trade secret information with Walker, which in turn allowed Walker to continue doing business with the distributors in E-Gate's EMEAA distribution network.**

**ANSWER**: Admitted that Walker formally retained Spano as an independent contractor in June 2023. Denied that Spano shared trade secret information with Walker. To the extent any other allegations in this paragraph require a response, Ms. Spano denies them.

60.     **Through the valuable trade secret information stolen from E-Gate, Walker and Spano continue to profit from the overseas distributorship network that E-Gate purchased for $1,000,000 from Mr. Gillfors in the late 1990's and worked for the next 25 years to strengthen and expand.**

**ANSWER**: Denied.

61.     **Walker has not paid E-Gate any money as consideration for purchasing E-Gate's exclusive distribution rights in the EMEAA territory.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

62.     Walker has also failed to pay E-Gate its 10% commissions earned on sales after December 31, 2022 that took place in E-Gate's exclusive EMEAA territory.

ANSWER: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

### First Claim for Relief
### Civil Theft against Walker and Spano

63.     E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.

ANSWER: Ms. Spano restates and incorporates by reference her answers and responses to the previous allegations as if fully set forth herein.

64.     E-Gate is the owner of the exclusive rights to distribute Walker products in the EMEAA.

ANSWER: Denied.

65.     By deception and without authorization, Walker and Spano have knowingly used, obtained, and exercised control over E-Gate's exclusive distribution rights in the EMEAA with the intent to permanently deprive E-Gate of those exclusive distribution rights.

ANSWER: Denied.

66.     As a direct and proximate result of Walker's and Spano's civil theft, E-Gate has suffered damages in an amount to be shown at trial.

ANSWER: Denied.

67.     Pursuant to C.R.S. § 18-4-405, Walker and Spano are liable to E-Gate for three times the amount of E-Gate's actual damages, plus costs and reasonable attorney's fees.

ANSWER: Denied.

### Second Claim for Relief
### Misappropriation of Business Value against Walker and Spano

68.     E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses to the previous allegations as if fully set forth herein.

**69.     E-Gate has spent considerable labor, skill, and money developing its distribution network in the EMEAA over the past 25 years.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the truth of this allegation and on that basis denies it.

**70.     As alleged herein, Walker and Spano have misappropriated the product of E-Gate's expenditure of labor, skill, and money and are wrongfully attempting to profit off of E-Gate's labor, skill, and money.**

**ANSWER**: Denied.

**71.     As a direct and proximate result of Walker's and Spano's misappropriation of E-Gate's business value, E-Gate has suffered damages in an amount to be shown at trial, including but not limited to the entire value of E-Gate's business that Walker and Spano effectively misappropriated for themselves.**

**ANSWER**: Denied.

### *Third Claim for Relief*
### *Breach of Contract against Walker*

**72.     E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.**

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses to the previous allegations as if fully set forth herein.

**73.     E-Gate had a valid contract with Walker under which Walker agreed to pay E-Gate 10% of all sales of Walker products within E-Gate's exclusive EMEAA territory, for as long as Walker sold products in the EMEAA territory.**

**ANSWER**: As this claim is directed against Walker alone, Ms. Spano understands there is no allegation in this paragraph requiring response from her. To the extent any response is required, Ms. Spano denies the allegations.

74.     **Walker has breached the parties' contract by failing to pay E-Gate its 10% commission on Walker products sold in the EMEAA territory after December 31, 2022.**

**ANSWER**: As this claim is directed against Walker alone, Ms. Spano understands there is

no allegation in this paragraph requiring response from her. To the extent any response is required,

Ms. Spano denies the allegations.

75.     **As a direct and proximate result of Walker's breach of its contract with E-Gate, E-Gate has suffered damages in amounts to be shown at trial.**

**ANSWER**: As this claim is directed against Walker alone, Ms. Spano understands there is

no allegation in this paragraph requiring response from her. To the extent any response is required,

Ms. Spano denies the allegations.

*Fourth Claim for Relief*
*Tortious Interference with Contract against Spano*

76.     **E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.**

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses

to the previous allegations as if fully set forth herein.

77.     **E-Gate had a valid contract with Walker under which Walker agreed to pay E-Gate 10% of all sales of Walker products within E-Gate's exclusive EMEAA territory, for as long as Walker sold products in the EMEAA territory.**

**ANSWER**: Denied.

78.     **Spano had knowledge of E-Gate's contract with Walker.**

**ANSWER**: Denied.

79.     **By engaging in an encouraging an illicit plan with Walker to circumvent E-Gate's rights under the contract for her own personal benefit, Spano interfered with E-Gate's contract with Walker using wrongful means and induced Walker to breach the contract.**

**ANSWER**: Denied.

**80.**     **Spano's interference with E-Gate's contract with Walker was knowing and intentional.**

**ANSWER**: Denied.

**81.**     **As a direct and proximate result of Spano's tortious interference with E-Gate's contract with Walker, E-Gate has suffered damages in amounts to be shown at trial.**

**ANSWER**: Denied.

<div align="center">

***Fifth Claim for Relief***
***Unjust Enrichment/Constructive Trust against Walker and Spano***

</div>

**82.**     **E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.**

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses

to the previous allegations as if fully set forth herein.

**83.**     **E-Gate conferred a benefit upon Walker by, inter alia, tirelessly working to cultivate and grow Walker's distribution network in the EMEAA over a 25-year period as alleged in detail herein.**

**ANSWER**: Ms. Spano lacks knowledge or information sufficient to form a belief as to the

truth of this allegation and on that basis denies it.

**84.**     **E-Gate similarly conferred a benefit upon Spano by devoting considerable time, money, and resources to teaching her the business and helping her develop relationships within E-Gate's distribution network.**

**ANSWER**: Denied.

**85.**     **The foregoing circumstances render it unjust for Walker and Spano to retain the benefits conferred upon them by E-Gate without duly compensating E-Gate for the same.**

**ANSWER**: Denied.

**86.**     **Each Defendant is now unjustly profiting from using E-Gate's EMEAA distribution network for their own benefit.**

**ANSWER**: Denied.

87.   As a direct and proximate result of Defendants' unjust enrichment, E-Gate has suffered damages in amounts to be shown at trial.

**ANSWER**: Denied.

88.   To prevent Defendants' unjust enrichment, a constructive trust must be placed on the revenues derived from Walker's and/or Spano's sales within E-Gate's territory to the extent of the commissions E-Gate should be receiving for as long as Walker's sales within the territory continue.

**ANSWER**: Denied.

### Sixth Claim for Relief
### Breach of Fiduciary Duty against Spano

89.   E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses to the previous allegations as if fully set forth herein.

90.   As an employee of E-Gate, Spano owed a duty of loyalty to E-Gate to act solely for the benefit of E-Gate in all matters connected with her employment.

**ANSWER**: Ms. Spano admits she was an employee of E-Gate. The remainder of this paragraph is a legal assertion that does not require a response.

91.   As a board member of E-Gate, Spano owed a fiduciary duty of loyalty to E-Gate to act with an extreme measure of candor, unselfishness, and good faith.

**ANSWER**: Ms. Spano admits that she was a (nominal) board member of E-Gate. The remainder of this paragraph is a legal assertion that does not require a response.

92.   By engaging in the conduct set forth herein, including but not limited to taking actions for her personal benefit to the detriment of E-Gate and taking steps to illicitly undermine its business while she remained an employee and director of E-Gate, Spano breached her fiduciary duties to E-Gate. In addition, Spano breached her fiduciary duties to E-Gate by sharing confidential E-Gate information with Marc Furrer (the managing director of Walker Mowers Switzerland AG), by conspiring with Mr. Furrer to cancel Walker Mowers Switzerland AG's long-term contract with E-Gate in November 2022, and by subsequently working as a part-time employee for Walker Mowers Switzerland AG.

**ANSWER**: Denied.

**93.     As a direct and proximate result of Spano's breaches of her duties to E-Gate, E-Gate has suffered damages in amounts to be shown at trial. As part of its recoverable damages, E-Gate is entitled to disgorgement of the compensation paid to Spano during the period of her disloyalty.**

**ANSWER**: Denied.

<div align="center">

*Seventh Claim for Relief*
*Aiding and Abetting Breach of Fiduciary Duty against Walker*

</div>

**94.     E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.**

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses to the previous allegations as if fully set forth herein.

**95.     As discussed above, Spano breached her fiduciary duties of loyalty owed to E-Gate.**

**ANSWER**: As this claim is directed against Walker alone, Ms. Spano understands there is no allegation in this paragraph requiring response from her. Nevertheless, Ms. Spano denies these allegations.

**96.     Walker knew that Spano was an employee of E-Gate and a board member of E-Gate. Thus, Walker knew that Spano owed fiduciary duties of loyalty to E-Gate, and Walker knew that Spano would breach her fiduciary duties if she started working for Walker's benefit and to E-Gate's detriment while still employed by E-Gate and while still sitting on E-Gate's board of directors.**

**ANSWER**: As this claim is directed against Walker alone, Ms. Spano understands there is no allegation in this paragraph requiring response from her. To the extent any response is required, Ms. Spano denies the allegations.

**97.     Nevertheless, Walker knowingly participated in and encouraged Spano to breach her fiduciary duties to E-Gate by encouraging her to share confidential and proprietary trade secret information regarding E-Gate's business and its contacts in its EMEAA distribution network while still serving as an E-Gate employee and director.**

**ANSWER**: As this claim is directed against Walker alone, Ms. Spano understands there is no allegation in this paragraph requiring response from her. Nevertheless, Ms. Spano denies these allegations.

98.     **As a direct and proximate result of Walker's aiding and abetting Spano's breach of her fiduciary duties to E-Gate, E-Gate has suffered damages in amounts to be shown at trial.**

**ANSWER**: As this claim is directed against Walker alone, Ms. Spano understands there is no allegation in this paragraph requiring response from her. Nevertheless, Ms. Spano denies these allegations.

### *Eighth Claim for Relief*
*Misappropriation of Trade Secrets against Walker and Spano*
*(Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 et seq.)*

99.     **E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.**

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses to the previous allegations as if fully set forth herein.

100.    **E-Gate is the owner of trade secrets, including but not limited to its customer lists, strategies, methodologies, and other proprietary and confidential information stored on its Basecamp CRM platform as alleged in detail herein.**

**ANSWER**: Denied.

101.    **E-Gate's trade secrets have considerable value.**

**ANSWER**: Denied.

102.    **E-Gate did not share its trade secrets and took reasonable measures to protect their secrecy. No one was allowed to access E-Gate's trade secrets other than its two directors, Mr. Loerli and Spano, and Spano's access to the trade secrets was for the limited purpose of furthering E-Gate's business operations.**

**ANSWER**: Denied.

103.    Spano and Walker acquired E-Gate's trade secrets by improper means, including Spano's misrepresentations, deceit, and breach of her duty to maintain the secrecy of the trade secrets pursuant to her employment contract and pursuant to her fiduciary duties.

ANSWER: Denied.

104.    Spano and Walker are now using E-Gate's trade secrets without E-Gate's express or implied consent.

ANSWER: Denied.

105.    Spano and Walker both knew and/or had reason to know that their acquisition and use of E-Gate's trade secrets were attended by improper means.

ANSWER: Denied.

106.    Spano's and Walker's misappropriation of E-Gate's trade secrets was willful, malicious, and attended by circumstances of a willful and wanton disregard of E-Gate's rights and feelings.

ANSWER: Denied.

107.    As a direct and proximate result of Defendants' misappropriation of E-Gate's trade secrets, E-Gate has suffered damages in amounts to be shown at trial, including but not limited to exemplary damages under C.R.S. § 7-74-104 and attorney's fees under C.R.S. § 7-74-105.

ANSWER: Denied.

### Ninth Claim for Relief
### Misappropriation of Trade Secrets against Walker and Spano
### (Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.)

108.    E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.

ANSWER: Ms. Spano restates and incorporates by reference her answers and responses

to the previous allegations as if fully set forth herein.

109.    E-Gate is the owner of trade secrets, including but not limited to its customer lists, strategies, methodologies, and other proprietary and confidential information stored on its Basecamp CRM platform as alleged in detail herein.

**ANSWER**: Denied.

110.     E-Gate's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other competitors who can obtain economic value from the disclosure or use of the information.

**ANSWER**: Denied.

111.     E-Gate did not share its trade secrets and took reasonable measures to protect their secrecy. No one was allowed to access E-Gate's trade secrets other than its two directors, Mr. Loerli and Spano, and Spano's access to the trade secrets was for the limited purpose of furthering E-Gate's business operations.

**ANSWER**: Denied.

112.     Spano and Walker acquired E-Gate's trade secrets by improper means, including Spano's misrepresentations, deceit, and breach of her duty to maintain the secrecy of the trade secrets pursuant to her employment contract and pursuant to her fiduciary duties.

**ANSWER**: Denied.

113.     Spano and Walker are now using E-Gate's trade secrets without E-Gate's express or implied consent.

**ANSWER**: Denied.

114.     Spano and Walker both knew and/or had reason to know that their acquisition and use of E-Gate's trade secrets were attended by improper means.

**ANSWER**: Denied.

115.     Spano's and Walker's misappropriation of E-Gate's trade secrets was willful and malicious.

**ANSWER**: Denied.

116.     As a direct and proximate result of Defendants' misappropriation of E-Gate's trade secrets, E-Gate has suffered damages in amounts to be shown at trial, including but not limited to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and attorney's fees under 18 U.S.C. § 1836(b)(3)(D).

**ANSWER**: Denied.

*Tenth Claim for Relief*
*Civil Conspiracy against Walker and Spano*

**117.    E-Gate realleges and incorporates by reference all averments contained within this Complaint as if fully set forth herein.**

**ANSWER**: Ms. Spano restates and incorporates by reference her answers and responses

to the previous allegations as if fully set forth herein.

**118.    Walker and Spano had a meeting of the minds to circumvent E-Gate's exclusive distribution rights by having Spano bring E-Gate's trade secrets and know-how to Walker so that Walker could cut E-Gate out of future sales commissions and have Spano work directly for Walker, thereby increasing profits for both Walker and Spano.**

**ANSWER**: Denied.

**119.    Walker and Spano committed one or more unlawful overt acts in furtherance of this scheme, including civil theft, misappropriation of business value, breach of contract, tortious interference with contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and misappropriation of trade secrets.**

**ANSWER**: Denied.

**120.    As a direct and proximate result of Defendants' civil conspiracy, E-Gate has suffered damages in amounts to be shown at trial.**

**ANSWER**: Denied.

*Request for Relief*

Ms. Spano denies that Plaintiff is entitled to any relief requested.

\*\*\*

Ms. Spano specifically denies any allegations not otherwise addressed above.

## AFFIRMATIVE DEFENSES

1.    Plaintiff's alleged damages, if any, were caused by Plaintiff in whole or in part.

2.    Plaintiff's alleged damages, if any, were caused by individuals or entities other than

Ms. Spano, or over whom Ms. Spano had no right or duty to control or supervise.

3.    Plaintiff's claims are barred in whole or in part by the doctrine of laches.

4.      Plaintiff's claims are barred in whole or in part by Plaintiff's failure to mitigate its damages, if any.

5.      Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

6.      Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

7.      Plaintiff's claims are barred in whole or in part by Plaintiff's consent to the complained-of conduct.

8.      Plaintiff's claims are barred to the extent the contract governing the relationship between Plaintiff and Walker is unlawful or unenforceable.

9.      Plaintiff's claims are barred to the extent the contract governing the relationship between Plaintiff and Walker fails to comply with the statute of frauds.

10.      Plaintiff's claims are barred to the extent the contract governing the relationship between Plaintiff and Walker is contrary to public policy.

11.      Plaintiff's claims are barred in whole or in part by Plaintiff's failure to abide by its own obligations pursuant to its relationship with Walker.

12.      Plaintiff's claims are barred in whole or in part by Plaintiff's failure to abide by its own obligations pursuant to its relationship with Ms. Spano.

13.      Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

14.      Plaintiff's claims are barred in whole or in part by the doctrine of recoupment.

15.      Plaintiff's claims are barred in whole or in part by the doctrine of setoff.

16.      Plaintiff's claims are barred in whole or in part by Plaintiff's settlement and release thereof.

17.     Ms. Spano reserves the right to raise any additional affirmative defenses that may become apparent over the course of this action.

## **<u>JURY DEMAND</u>**

Ms. Spano hereby demands a trial by jury on all claims and issues so triable.

Respectfully submitted this 15th day of November, 2023.

<div style="margin-left:40%">

*/s/  Douglas N. Marsh*
Cambridge Law LLC
Douglas N. Marsh, #45964 (CO)
4610 South Ulster Street Suite 150
Denver, Colorado 80237
Telephone: 303-488-3338
Email: doug@cambridgelawcolorado.com

</div>